# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | Civil Action No.  4:17-CV-101 |
| v. | § | |
| | § | Judge Mazzant |
| ARNOLDO ANTONIO VASQUEZ | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER AND
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 20, 2018, the parties appeared before the Court for a trial of this case, at which

time the Court heard evidence and argument of counsel.  The trial concluded on August 22, 2018.

The Court hereby enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of

Civil Procedure 52.  Any finding of fact which constitutes a conclusion of law shall be deemed a

conclusion of law, and any conclusion of law which constitutes a finding of fact shall be deemed a

finding of fact.

## EXPERT WITNESS TESTIMONY

Expert witness testimony is admissible if it meets the standard set out in the Federal Rules

of Evidence.  Federal Rule of Evidence 702 provides for the admission of expert testimony that

assists the trier of fact to understand the evidence or to determine a fact in issue.  FED. R. EVID. 702.

A district court must make a preliminary determination as to whether the requirements of Rule 702

are satisfied with regard to a particular expert's proposed testimony.  *See Daubert v. Merrell Dow

Pharm., Inc.*, 509 U.S. 579, 592–93 (1993).  Courts act as gatekeepers of expert testimony "to make

certain that an expert, whether basing testimony upon professional studies or personal experience,

1

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The party offering the expert's testimony has the burden to prove by a preponderance of the evidence that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91.

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

The Government offered the expert testimony of Professor Terry Lynn Karl without objection. Professor Karl is a Gildred Latin American Studies Professor Emeritus at Stanford

University in the field of political science. The parties stipulated to Professor Karl's specialties in Latin American politics, military and authoritarian regimes as well as the subsequent transitions to democracy generally in Latin America and Central America, including El Salvador. It is without question that Professor Karl is learned in her field. Professor Karl testified at length with respect to the history preceding the San Sebastian massacre, the massacre itself, and the investigations which subsequently ensued. Professor Karl's historical perspective was beneficial to the Court in its fact finding role in this case and is, therefore, admissible.

At the outset of her testimony, Professor Karl offered two overarching opinions. First, Professor Karl opined that the Defendant assisted and participated in the San Sebastian massacre that occurred on September 21, 1988 in El Salvador. Second, Professor Karl opined that the Defendant's testimony that he was neither detained nor arrested in connection with his alleged role in the San Sebastian massacre was implausible, unbelievable and contrary to documentary evidence. Professor Karl reached these conclusions after reviewing documents from the following sources: (1) The El Salvadoran Court of the First Instance; (2) the United Nations Commission on the Truth for El Salvador; (3) the Defendant's military service record; (4) the United Nations Ad Hoc Commission; and (5) declassified documents from the United States government. While the Court appreciates Professor Karl's expertise about this historical period, the Court finds that Professor Karl's opinions regarding the ultimate findings concerning the Defendant's participation in the San Sebastian massacre as well as the Defendant's credibility regarding whether he was detained or arrested in connection with the San Sebastian massacre should be excluded. This testimony is a commentary on the Defendant's credibility as well as the documentary evidence in this case. *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 644 (S.D. Tex. 2008). Given that it is the fact finder's role "to assess the

evidence and to determine the contested issues of fact", the Court finds such testimony exceeds the scope of admissible expert testimony and is hereby excluded.  *Id*.

The Court notes that with the exception of the Defendant himself, the Government did not offer any direct testimony in the presentation of its case with respect to the Defendant's military record or the San Sebastian massacre.  Although Professor Karl referenced witnesses to the San Sebastian massacre, the Government did not produce the witnesses at trial.  As such, the crux of the Government's case rests on Professor Karl's opinions with her ultimate findings and conclusions having now been excluded.

## FINDINGS OF FACT

### DEFENDANT'S BACKGROUND

1.  Defendant Arnoldo Antonio Vasquez (the "Defendant") was born in San Salvador, El Salvador in 1962 (Trial Tr. Vol. I at 21:6-8, 24-25; 22:1-2).

2.  After high school, the Defendant attended the Escuela Capitan Gerardo Barrios Military School in El Salvador (Trial Tr. Vol. I at 26:16-19).

3.  The Defendant entered the Escuela Capitan Gerardo Barrios Military School as a cadet, training to become an officer in the Salvadorian military (Trial Tr. Vol. I at 32:5-15).

4.  The Defendant's speciality in the military was communications and transmissions. He was trained as a communications officer in charge of the transmission of information between units and the commander (Trial Tr. Vol. I at 33:9 - 34:1).

5.  While he was a cadet, the Defendant studied at the Center for Instruction of Transmissions of the Armed Forces ("CITFA") (Trial Tr. Vol. I at 36:16-37:6).

6.  The Defendant graduated from the Escuela Capitan Gerardo Barrios Military School as an officer in the Salvadorian military in May 1986 (Trial Tr. Vol I at 37:7 - 40:5; Gov't Trial Ex. 5).

7.  In May 1986, the Defendant attained the rank of Second Lieutenant (Gov't Trial Ex. 5).

8.  The Defendant was assigned to CITFA as an officer in May 1986 (Trial Tr. Vol. I at 40:6-13; Gov't Trial Ex. 5).

9.  While assigned to CITFA, the Defendant worked in his area of specialty, *i.e.* communications. One of his duties was encrypting messages from commands (Trial Tr. Vol. I at 45:4-10).

10. At CITFA, the Defendant worked for the Atlacatl Battalion and its commanders, Major Asmitin Melara and Colonel Domingo Monterrosa Barrios ("Monterrosa") Trial Tr. Vol. I at 48:2-18).

11. The Defendant took command of the Second Infantry Section of the Jiboa Battalion, Fifth Brigade on September 1, 1988 (Trial Tr. Vol. I at 58:7-18; Gov't Trial Ex. 5).

12. The Defendant was the officer in charge of the Second Infantry Section (Trial Tr. Vol. I at 62:6-8).

**THE SALVADORIAN CIVIL WAR AND THE SALVADORIAN MILITARY'S HUMAN RIGHTS ABUSES**

13. Between 1980 and 1991, El Salvador was consumed in a civil war between the government of El Salvador and guerilla forces (Joint Final Pretrial Order ¶ E(8)).

14. The El Salvadorian Armed Forces ("ESAF") had ruled El Salvador for over 60 years prior to being challenged first in the 1970s by a civilian popular movement and then

by an armed opposition group, the Farabundo Marti National Liberation Front ("FMLN"), formed in 1980 (Joint Final Pretrial Order ¶ E(9)).

15.     Beginning in October 1979, the ESAF responded to attempts to transition from military rule to democracy by a campaign of terror characterized by a pattern of widespread massacres, murder, torture, and forced disappearances, aimed largely at civilian non-combatants (Gov't Trial Ex. 10 at 13-14; Gov't Trial Ex. 12 at 27; Trial Tr. Vol. II at 25:25-26:6).

16.     During the civil war, the ESAF was one of the leading abusers of human rights in contemporary Latin American history.  (Gov't Trial Ex. 10 at 14).  It was the most intense civil war in modern Latin American history (Trial Tr. Vol. II at 28:8-9).

17.     The ESAF overwhelmingly targeted civilian victims who were peasants living in rural areas presumed to be guilty of supporting land reform, belonging to peasant organizations, or of being unarmed supporters of the FMLN (Gov't Trial Ex. 10 at 16; Trial Tr. Vol. II at 27:19-20). The idea was to kill peasants in the countryside who were demanding agrarian reform (Trial Tr. Vol. II at 27:3-4).

18.     Human rights abusers were virtually never brought to justice, except in notorious cases involving the murders of United States citizens.   Officers were never prosecuted (Gov't Trial Ex. 10 at 17; Trial Tr. Vol. II at 21:13-22, 35:1-12).

19.     ESAF officer impunity was rooted in a code of silence by which officers did not report each other's criminal acts (Gov't Trial Ex. 10 at 19; Trial Tr. Vol. II at 36:8-37:9). The EASF also resisted any effort to investigate human rights abuses by

military officers and systematically protected alleged abusers (Gov't Trial Ex. 10 at 20-21).

20.     In cases where human rights abuses became international scandals and the ESAF leadership was subsequently pressed to deliver culpable officers, coordinated cover-ups followed and involved several stages: (1) reassuring the United States government, which was providing significant assistance to the ESAF, that the military would investigate; (2) initially denying that any violations occurred or that a particular entity was involved; (3) once the violation was undeniable, admitting to the atrocity but directing responsibility elsewhere, especially to the FMLN; (4) when evidence was irrefutable and external pressure was extremely strong, promising to investigate; (5) if pressure continued, forming a military commission designed to hide the involvement of top officers, protecting other officers where possible, and blaming low-level soldiers; (6) holding a military or civilian trial, which was flawed by the threatening of witnesses and judges; and, finally, (7) delaying justice until the United States' attention waned, then quietly freeing the officer(s) either through amnesty or dismissal (Gov't Trial Ex. 10 at 21-22; Trial Tr. Vol. II at 45:21-47:10).

21.     It was common practice for the military to threaten or murder witnesses or potential witnesses and judges to prevent accountability in civilian courts (Trial Tr. Vol. II at 48:25-49:2, 49:15-50:8; Gov't Trial Ex. 10 at 23-24).

**THE SAN SEBASTIAN MASSACRE AND COVER-UP**

22.     At the time of the San Sebastian massacre, the commander of the Fifth Brigade was Colonel Jose Emilio Chavez Caceres ("Chavez"). Major Mauricio de Jesus Beltran

Granados ("Beltran") was directly under him (Gov't Trial Ex. 12 at 80; Trial Tr. Vol. II at 82:1-5). Chavez and Beltran were stationed at the Fifth Brigade in San Vicente (Trial Tr. Vol. II at 82:5-7; Gov't Trial Ex. 13; Gov't Trial Ex. 14 at 23).

23.   The Jiboa Battalion was a part of the Fifth Brigade and was structured into companies and the companies structured into sections (Gov't Trial Ex. 14 at 23). The commander of the Jiboa Battalion was Captain Oscar Armando Peña Duran ("Peña") (*Id*.; Trial Tr. Vol. II at 82:8-10).

24.   Lieutenant Manuel de Jesus Galvez Galvez ("Galvez") was the commander of the Second Company of the Jiboa Battalion (Trial Tr. Vol. II at 82:8-13; Gov't Trial Ex. 14 at 23-24).

25.   The Defendant was the commander of the Second Infantry Section of the Second Company of the Jiboa Battalion (Trial Tr. Vol. I at 58:7-12; Joint Final Pretrial Order ¶ E(7)).

26.   As Commander of the Second Section of the Jiboa Battalion, the Defendant's responsibilities included investigating and capturing guerilla members (Joint Final Pretrial Order ¶ E(10)).

27.   The Defendant received an order to investigate and capture suspected guerillas in San Francisco, a small town outside of the larger town of San Sebastian (Trial Tr. Vol. I at 63:1-6, 63:18-23; Trial Tr. Vol. II at 83:5-9; Joint Final Pretrial Order ¶ E(11); Gov't Trial Ex. 14 at 24).

28. Specifically, Fifth Brigade intelligence reports stated that a person named "Nicolas N." was in the village of San Francisco and was a member of rebel groups operating there (Trial Tr. Vol. II at 83:13-20; Joint Final Pretrial Order ¶ E(12)).

29. San Francisco is approximately six hours from San Vicente by foot (Trial Tr. Vol. II at 83:8-9).

30. The order to capture suspected guerillas originated from Beltran, who was the Fifth Brigade's intelligence officer, and included names and addresses of the guerillas to be captured (Trial Tr. Vol. I at 63:7-23, 64:15-20, 65:6-11).

31. On September 20, 1988, the Defendant and soldiers of his section complied with the order and went from the town of San Sebastian to the village of San Francisco to locate and capture Nicolas N., as well as other guerillas that the Defendant was ordered to find (Trial Tr. Vol. I at 65:20-22; Joint Pretrial Order ¶ E(13); Gov't Trial Ex. 14 at 24-25).

32. The Defendant, "as the one in charge of the unit," gave orders to the soldiers of his section to capture the individuals (Trial Tr. Vol. I at 67:19-23). The Defendant "just gave the orders" and did not physically capture the individuals himself (*Id*. at 67:23, 68:2-5). He ordered his sergeant to capture the individuals and they followed his orders (*Id*. at 68:11-18).

33. The Defendant and the soldiers of his section were each armed with semi-automatic rifles during this mission (Trial Tr. Vol. I at 70:4-8).

34. The Defendant and soldiers of his section found a person named Jose Maria Flores Alfaro ("Flores"), who was not Nicolas N., who confessed to belonging to or

collaborating with subversive groups (Trial Tr. Vol. II at 84:4-8; Joint Final Pretrial Order ¶ E(14); Gov't Ex. 14 at 27).

35. The Defendant and soldiers of his section detained Flores and three other individuals who Flores had alleged to be subversives (Trial Tr. Vol. II at 83:24-84:16; Gov't Trial Ex. 14 at 29-30).

36. The Defendant and soldiers of his section found weapons and explosive devices on some of the captured individuals (or in their homes), confiscated those items, and turned them over to the Defendant (Trial Tr. Vol. I at 70:9-12, 71:2-4; Joint Final Pretrial Order ¶¶ E(16), E(17); Gov't Trial Ex. 14 at 28-29).

37. After capturing the individuals and searching their homes, the Defendant and soldiers of his section moved the individuals to a local building and held them under guard (Trial Tr. Vol. I at 71:15-17, 22-24). The detainees were not armed while they were detained (*Id*. 72:16-21).

38. After the Defendant detained Flores, Beltran issued an order down the chain of command to dress Flores in black clothes and kill him (Trial Tr. Vol. I at 78:5-7; Trial Tr. Vol. III at 90:18-23; Joint Pretrial Order ¶ E(18); Gov't Trial Ex. 14 at 30-31.

39. The order was received by Peña, who transmitted it to Galvez (Trial Tr. Vol. II at 85:5-18; Gov't Trial Ex. 12 at 81; Gov't Trial Ex. 14 at 30). Both Peña and Galvez were opposed to killing the detainee and took the position that the order had to be in writing if the Fifth Brigade persisted in this order because it was an illegal order (Trial Tr. Vol. II at 85:10-21; Gov't Trial Ex. 12 at 81; Gov't Trial Ex. 14 at 30).

40. The Defendant claims that he spoke to Peña who told the Defendant that he needed to have the order to kill put in writing (Trial Tr. Vol. I at 77:23-78:1; Trial Tr. Vol. III at 53:7-8).

41. The Defendant received the order to kill directly from Beltran, circumventing the chain of command of Peña and Galvez, after Peña informed Beltran of his opposition (Trial Tr. Vol. III at 53:7-13).

42. At the time the Defendant became aware of this kill order, Beltran was not in San Sebastian but was at the brigade headquarters in San Vicente (Trial Tr. Vol. I at 74:22-25).

43. At the time the Defendant became aware of this kill order, he was in command of his section as well as the detainees who were being held under his command (Trial Tr. Vol. I at 78:14-24).

44. The Defendant spoke to Beltran directly before Beltran arrived on the scene. Beltran told the Defendant that he was going to come to the detention location to conduct an investigation (Trial Tr. Vol. I at 79:16-18, 80:10-15).

45. Beltran told the Defendant to stay with the detainees (Trial Tr. Vol. I at 80:7-9).

46. The Defendant knew that Beltran had ordered him to kill at least one of the detainees (Trial Tr. Vol. I at 76:20-22; Trial Tr. Vol. III at 93:24-94:8).

47. The Defendant continued to detain the individuals after speaking with Beltran, knowing that Beltran was coming to the scene after having issued the order to kill (Trial Tr. Vol. I at 80:10-14).

48. The Defendant knew that Beltran intended to kill the detainees, and not merely conduct an investigation, when Beltran arrived at the site (Trial Tr. Vol. I at 99:16-23, 100:12-16).

49. Flores Alfaro was placed in black clothing (Trial Tr. Vol. III at 90:24-25; Gov't Trial Ex. 14 at 30-31).

50. Galvez arrived at the scene of the detentions in San Francisco on the morning of September 21, 1988 (Trial Tr. Vol. II at 90:1-2; Gov't Trial Ex. 12 at 82; Gov't Trial Ex. 14 at 31).

51. Beltran arrived from San Vicente to the scene of the detentions on the morning of September 21, 1988, at some time after Galvez arrived (Trial Tr. Vol. I at 79:21:22; Trial Tr. Vol. II at 93: 19-24; Gov't Trial Ex. 12 at 82; Gov't Trial Ex. 14 at 31).

52. Beltran arrived in San Francisco with additional intelligence soldiers and subsequently ordered the detention of additional individuals (Trial Tr. Vol. I at 83:13-21; Gov't Trial Ex. 12 at 82).

53. After Beltran arrived in San Francisco, Galvez, not wanting "to get into any trouble" nor wanting "to get the soldiers of his Company in any trouble," told Beltran to take over command of the company (Gov't Trial Ex. 14 at 34; Gov't Trial Ex. 12 at 82; Trial Tr. Vol. II at 94:9-18). Other soldiers and witnesses heard Galvez handing over command to Beltran and previously testified to hearing Galvez hand over command of his company to Beltran (Gov't Trial Ex. 14 at 34; Trial Tr. Vol. II at 94:7-95:1).

54. After relinquishing his command, Galvez left the site of the eventual massacre and the site of the massacre preparations (Trial Tr. Vol. II at 95:15-24, 95:25-96:1).

55. A superior officer, such as Beltran, would automatically displace a junior officer when arriving on site (Trial Tr. Vol. I at 89:12-14; Gov't Trial Ex. 14 at 31). The Defendant states that, at that time, while he was relieved of his command, he was not relieved from duty (Trial Tr. Vol. I at 145:23-146:5).

56. After Beltran arrived on the scene and Galvez relinquished command, the Defendant was the second highest ranking officer (Trial Tr. Vol. I at 85:16-17, 87:7-10; Trial Tr. Vol. II at 95:25-96:4). The Defendant continued to carry his weapon, a rifle (*Id*. at 89:7-11).

57. Under Salvadorian military law and practice, while a superior officer automatically assumed command upon his appearance at a site, the lower-ranking officer did not lose his rank, capacity to order his own soldiers to carry out specific tasks, or his capacity to carry out orders given to him (Gov't Trial Ex. 10 at 37).

58. The Defendant continued to remain on the scene, next to the place where the detainees were being held (Trial Tr. Vol. I at 89:2-6). Indeed, the Defendant was relatively close to the ambush (*Id*. at 96:23-25).

59. The Defendant remained outside of the place where the detainees were being held following Beltran's arrival (Trial Tr. Vol. I at 90:4-8). In contrast, after publicly relinquishing his command to Beltran, Galvez left the location, and went to meet with members of the community where he gave a speech (Trial Tr. Vol. II at 95:10-24).

60. When Beltran arrived, the Defendant informed Beltran who the Defendant's soldiers were (Trial Tr. Vol. I at 89:22-23).

61.    After Beltran arrived, Beltran ordered the capture and detention of additional individuals (Trial Tr. Vol. I at 83:24-84:2; Gov't Trial Ex. 12 at 82; Gov't Trial Ex. 14 at 472).

62.    After Beltran arrived, Beltran began questioning the detainees in an area down a hill from where the individuals had been detained (Trial Tr. Vol. I at 92:8-11, 18-21).

63.    At the time Beltran arrived and interviewed the detainees, the Defendant was still in charge and was not relieved of his command (Trial Tr. Vol. I at 81:16-82:2, 83:3-12).

64.    Beltran ordered the soldiers to execute the detainees by simulating a guerilla ambush (Gov't Trial Ex. 12 at 82; Trial Tr. Vol. I at 95:12-17; Trial Tr. Vol. II at 97:3-5).

65.    The Defendant claims that Beltran released him from his command after Beltran ordered the ambush and the Defendant refused to comply with the order (Trial Tr. Vol. I at 83:3-10, 84:8-14). However, unlike Galvez where testimony from the soldiers supports his claim of relinquishment, there is not corroborating evidence that the Defendant relinquished his command (Trial Tr. Vol. II at 103:18-25, 105:3-5). Professor Karl opined that it is unlikely that an officer who relinquished his command would not physically distance himself from the event (*Id.* at 113:3-12).

66.    The Defendant heard the soldiers preparing to kill the detainees (Trial Tr. Vol. I at 96:7-8, 95:18-20). The Defendant saw the soldiers prepare for an ambush (*Id.* at 93:20-22, 94:20-24). The Defendant knew his soldiers were preparing for an ambush because Beltran had given the ambush order before the Defendant was relieved of his command (*Id.* at 83:7-10).

67.    The soldiers who were preparing for the ambush used the explosives the Defendant had obtained from the detainees (Gov't Trial Ex. 12 at 81-82; Trial Tr. Vol. I at 96:20-22; Trial Tr. Vol. II at 100:10-14). The Defendant was relatively close by when the soldiers were preparing for the ambush (Trial Tr. Vol. I at 96:23-25; Trial Tr. Vol. II at 100:15-17).

68.    The Defendant knew that the purpose of the staged ambush was to kill the detainees, but asserts that he lacked the authority to stop the massacre (Trial Tr. Vol. I at 97:11-12, 134:12-23; Trial Tr. Vol. II at 100:17-18; Joint Final Pretrial Order ¶¶ E(21)).

69.    The Defendant did not say anything to the soldiers of the Second Section to stop them from killing the detainees (Trial Tr. Vol. I at 101:2-11, 134:25-135:1; Joint Final Pretrial Order ¶ E(23)).

70.    On the afternoon of September 21, 1998, the detainees, now numbering 10, were lined up along a roadway leading to another village to be killed (Trial Tr. Vol. II at 97:9-24; Joint Final Pretrial Order ¶ E(24); Gov't Trial Ex. 14 at 35).

71.    Soldiers of the Second Section set off the confiscated explosives near the site where the detainees were taken to be killed (Gov't Trial Ex. 12 at 82-83; Trial Tr. Vol. II at 97:16-24; Joint Final Pretrial Order ¶ E(21)). Soldiers shot off their weapons to simulate an ambush (Gov't Trial Ex. 12 at 83; Trial Tr. Vol. II at 97:18-21).

72.    Soldiers of the Second Section shot the detainees at close range after the explosives were detonated (Gov't Trial Ex. 12 at 83; Trial Tr. Vol. II at 98:10-16, 99:2-4).[1]

---

[1]The Government contends, but the Defendant disputes, that the Defendant transmitted an order to soldiers of the Second Section to finish off any detainee who was left alive after the detonation of explosives (Gov't Trial Ex. 12 at 82; Trial Tr. Vol. II at 100:19-23).

73.  As a result of the incident, 10 unarmed civilians were killed (Gov't Trial Ex. 12 at 80; Trial Tr. Vol. II at 113:13-18; Joint Final Pretrial Order ¶ E(25)). This incident came to be known in El Salvador as the San Sebastian massacre (Gov't Trial Ex. 12 at 80; Joint Final Pretrial Order ¶ E(25)).

74.  Following the killings, Beltran left the site by helicopter (Trial Tr. Vol. I at 104:2-4; Trial Tr. Vol. II at 99:11-16; Gov't Trial Ex. 12 at 83). At this point, the Defendant was reinstated and was then the highest ranking officer of the section (Trial Tr. Vol. I at 105:7-8).

75.  Following the killings, Beltran ordered the Defendant not to speak to the media—which had now arrived on the scene—and to return the soldiers of the Second Section back to the brigade headquarters (Trial Tr. Vol. I at 104:5-18; Trial Tr. Vol. II at 101:8-11; Joint Final Pretrial Order ¶ E(26)).

76.  The Defendant complied with the order and returned his soldiers to the brigade headquarters (Trial Tr. Vol. I at 104:19-21).

77.  After the Defendant returned to the brigade headquarters, Chavez called the Defendant and ordered him to await Beltran's preparation of a lie in response to inquiries about the San Sebastian massacre (Trial Tr. Vol. I at 105:17-23; Joint Final Pretrial Order ¶¶ E(27), E(28)).

78.  The Defendant understood the lie he was ordered to repeat was that he had captured some guerillas in San Sebastian and that he was ambushed by them (Trial Tr. Vol. I at 105:7-13; Joint Final Pretrial Order ¶ E(29)).

79. The Defendant knew this was not the truth (Trial Tr. Vol. I at 105:14-15; Joint Final Pretrial Order ¶ E(30)).

80. The Defendant took the soldiers of the Second Section back to San Sebastian to walk them through the lie and make sure the soldiers got the lie correct (Trial Tr. Vol. I at 106:25-107:3, 107:13:16; Gov't Trial Ex. 12 at 84; Joint Final Pretrial Order ¶ E(32)).

81. On October 29, 1988, Chavez announced at a press conference that the detainees had died in an ambush and that the guerrillas had returned during the night and mutilated the bodies to make it look as if they had been executed at close range (Gov't Trial Ex. 12 at 84; Gov't Trial Ex. 17 at 13).

**INVESTIGATIONS INTO THE SAN SEBASTIAN MASSACRE**

82. The Commission for the Investigation of Criminal Acts ("the Commission"), a Salvadorian military commission, interviewed the Defendant during its investigation of the San Sebastian incident (Gov't Trial Ex. 12 at 84; Trial Tr. Vol. I at 107:25-108:2, 108:3-4; Joint Final Pretrial Order ¶ E(33)).

83. The Commission first interviewed the Defendant on September 27 and 28, 1988 (Gov't Trial Ex. 12 at 84; Joint Final Pretrial Order ¶ E(33)).

84. The Defendant initially provided the Commission with the ambush lie that Beltran had manufactured as the cover-up (Gov't Trial Ex. 12 at 84; Trial Tr. Vol. I at 108:5-8; Joint Final Pretrial Order ¶ E(34)).

85. By the end of 1988, the investigation appeared to be going nowhere, hampered by Salvadorian rules of evidence which precluded criminal participants from testifying

17

against another participant, the lack of eye witnesses except for the military perpetrators, and death threats against the judge in charge of the case (Gov't Trial Ex. 10 at 42-43).

86. In February 1989, then United States Vice President Dan Quayle traveled to El Salvador and provided the ESAF with the names of three Salvadorian officers responsible for the San Sebastian massacre: Chavez, Beltran, and the Defendant (Gov't Trial Ex. 12 at 84; Gov't Trial Ex. 10 at 43; Trial Tr. Vol. II at 117:13-118:5, 118:11-14; Joint Final Pretrial Order ¶ E(36)).

87. Vice President Quayle demanded that the military turn over Chavez, Beltran, and the Defendant to civilian courts within 30 days for their participation in a "cold-blooded execution and conspiracy to cover up murder" (Gov't Trial Ex.10 at 43-44; Trial Tr. Vol. II at 118:22-25, 119:8-10).

88. The Defendant abandoned the ambush lie after learning the military commission was going to blame him for the San Sebastian massacre (Trial Tr. Vol. I at 109:10-17).

89. During February and March 1989, the Defendant and all of the soldiers involved in the San Sebastian massacre, except for Beltran, abandoned the ambush lie and stated that Beltran had ordered the executions and the cover-up (Gov't Trial Ex. 12 at 84; Joint Final Pretrial Order ¶ E(35)).

90. In March 1989, the Commission, having interrogated the military personnel who had been in San Francisco, identified Beltran as having ordered the executions and identified the Defendant, among other soldiers, as having been responsible for

carrying out the orders (Gov't Trial Ex. 12 at 84-85; Gov't Trial Ex. 10 at 45-46; Joint Final Pretrial Order ¶ E(37)).

91.     The Commission sent the results of its investigation to the Court of the First Instance of San Sebastian in March 1989 (Gov't Trial Ex. 12 at 85; Gov't Trial Ex. 20; Joint Final Pretrial Order ¶ E(39)).

92.     The Defendant was investigated for committing the crime of intentional homicide of the 10 civilians in the village of San Francisco, near San Sebastian (Gov't Trial Ex. 14 at 6-7; Gov't Trial Ex. 23).

93.     The first civilian judge in the San Sebastian massacre case fled to the United States after receiving death threats (Trial Tr. Vol. II at 51:2-3).[2] Vice President Quayle demanded that the government of El Salvador provide protection to its civilian legal authorities, including defense against reprisals, that were not being provided and caused an intense fear around the case (*Id*. at 120:4-11).

94.     The Court of the First Instance issued a civil order instructing the military that the Defendant be confined to military quarters during its proceedings beginning in March 1989 (Gov't Trial Ex. 12 at 85; Gov't Trial Ex. 23). The Defendant stayed in military barracks (Trial Tr. Vol. II at 124:7-14).

95.     On February 17, 1990, the Court of the First Instance of San Sebastian, after "[c]onsidering the reasons set out and the evidence provided and with the trial process sufficiently and duly vetted" decided to acquit the Defendant and

---

[2]The Government contends, via expert testimony, that the second judge, Alcides Guandique, issued rulings based on the military's wishes because he was concerned about the United States' ability to protect him (Trial Tr. Vol. II at 51:12-18).

immediately released him upon the deposit of bail (Gov't Trial Ex. 14 at 43-44; Joint Final Pretrial Order ¶ E(40)).

96.     On February 17, 1990, the Court of the First Instance of San Sebastian referred Beltran and a soldier of the Second Section, Rafael Rosales Villalobos ("Villalobos"), to Plenary Court for the crime of intentional homicide for the San Sebastian massacre (Gov't Trial Ex. 14 at 43-44; Gov't Trial Ex. 12 at 85). In addition to acquitting the Defendant, the Court of the First Instance acquitted the remaining soldiers tried for the San Sebastian massacre (Gov't Trial Ex. 14 at 43-44; Gov't Trial Ex. 12 at 85).

97.     On April 25, 1990, the Court of the Center's Third Section, Court of the First Instance, issued an appellate ruling, upholding the Defendant's acquittal of the charge of intentional homicide and ordered his immediate release without bail (Joint Final Pretrial Order ¶ E(41)).  The Court found as such based on the following testimony provided by Galvez: "that there was opposition from several soldiers and conscripts, as well as [Galvez] and [the Defendant] to eliminate the persons," "that he didn't see [the Defendant] committing any illegal act or attempting against the lives or possessions of the prisoners; that he didn't hear [the Defendant] give any order that attempted against the lives or possessions of the prisoners" (Gov't Trial Ex. 14 at 52).

98.     On April 25, 1990, the Court of the Center's Third Section, Court of the First Instance, repealed the ruling referring Villalobos's case to Plenary Court (Gov't Trial Ex. 14 at 58).

99. Beltran, though convicted for his role in the San Sebastian massacre, had his sentence eventually dismissed (Gov't Trial Ex. 10 at 47). Ultimately, no one was held accountable for the San Sebastian massacre (Trial Tr. Vol. II at 123:21-22).

**INTERNATIONAL INVESTIGATIONS INTO THE SAN SEBASTIAN MASSACRE**

100. In accordance with the peace agreement between the Government of El Salvador and the FMLN that resolved the civil war, the United Nations established the Commission on the Truth for El Salvador ("Truth Commission") (Gov't Trial Ex. 12 at 11). The Truth Commission's mandate required it to examine systematic atrocities both individually and collectively, "putting an end to any indication of impunity on the part of officers of the armed forces" (*Id*.) The Truth Commission obtained information from the sites of the various incidents, accepted written statements, and took testimony from witnesses, including summoning to testify "anyone who might have been involved" (*Id*. at 12).

101. "Whenever the Commission decided that its investigation of a specific case had yielded sufficient evidence, the matter was recorded in detail, with mention of the guilty parties" (Gov't Trial Ex. 12 at 13).

102. On March 15, 1993, the Truth Commission presented its findings and recommendations in a formal report to the United Nations Security Council (Gov't Trial Ex. 12).

103. In relation to the San Sebastian Massacre, the Truth Commission specifically found that the Defendant "transmitted Major Beltran's order to designate some soldiers to finish off the victims and also provided the necessary materials to activate the mines

21

which seriously wounded them" (Gov't Trial Ex. 12 at 80, 82, 85). The Truth Commission's findings were based on the testimony of four soldiers who were present and participated in the San Sebastian Massacre (*Id.* at 226 n.262 & n.263).

**THE DEFENDANT'S MILITARY SERVICE FOLLOWING THE SAN SEBASTIAN MASSACRE**

104.    As a part of the peace process following the civil war, the United Nations established an Ad Hoc Commission composed of three Salvadorians and advised by two retired Salvadorian military generals (Gov't Trial Ex. 10 at 8). The Ad Hoc Commission was charged with reviewing the human rights and professional records of military officers and interviewing the same with the aim of recommending the removal of officers with verified poor human rights records (*Id.*; Trial Tr. Vol. II at 12:6-14:17, 90:13-14).

105.    The ESAF transferred the military service records of soldiers and officers—which was a complete record of one's military history and included all positions, training, disciplinary incidents, detentions, and arrests—to the Ad Hoc Commission (Trial Tr. Vol. II at 13:1-15).

106.    The Defendant's Ad Hoc Commission military record includes an entry detailing an April 1992 arrest for 15 days "for scandalous behavior for drunkenness and hitting one person" at a restaurant (Gov't Trial Ex. 9, ECF No. 42-3 at 13).

107.    The Defendant was interviewed by the Ad Hoc Commission in April 1992 (Gov't Trial Ex. 9 at 14-15; Trial Tr. Vol. II at 57:20-23).

108.     On December 31, 1992, the Defendant was released from assignment in the Special

         Military Security Brigade because he requested to be moved to the National Ministry

         of Defense Special Professionalization Program (Gov't Trial Ex. 5).

**VASQUEZ'S ADMISSION TO THE UNITED STATES**

109.     On December 18, 1998, the Defendant filed U.S. Department of State Optional Form

         DS-230, Application for Immigrant Visa and Alien Registration ("Form DS-230"),

         at the American Embassy in San Salvador, El Salvador (Gov't Trial Ex. 4; Joint Final

         Pretrial Order ¶ E(42)).

110.     On January 13, 1999, based upon his answers to his Form DS-230 and interview with

         a United States Consular Officer, the United States Department of State issued the

         Defendant an immigrant visa under the classification F32, spouse of an F31

         immigrant, which is the classification for a married son or daughter of a United

         States citizen (Gov't Trial Ex. 6, Immigrant Visa; Joint Final Pretrial Order ¶ E(47)).

111.     On February 13, 1999, the Defendant used his immigrant visa to gain admission to

         the United States as an immigrant – classification F32, spouse of an F3l immigrant

         – and to obtain United States legal permanent resident status (Gov't Trial Ex. 6; Joint

         Final Pretrial Order ¶ E(48)).

**THE DEFENDANT'S APPLICATION FOR NATURALIZATION**

112.     The Defendant filed a Form N-400, Application for Naturalization, with United

         States Citizenship and Immigration Services ("USCIS") on February 23, 2004 (Gov't

         Trial Ex. 2; Trial Tr. Vol. I at 126:8-127:2; Joint Final Pretrial Order ¶ E(49)).

113. In his application for naturalization, the Defendant answered "Yes" in response to Part 10, Section D, Question 16, which asked: "Have you **EVER** been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?" (Joint Final Pretrial Order ¶ E(50)).

114. In his application for naturalization, in response to Part 10, Section D, which requested: "If you answered 'Yes' to any of questions 15 through 21, complete the following table;" the Defendant provided the following responses to the questions asked in the table:

| Why were you arrested, cited, detained, or charged? | Date arrested, cited, detained or charged (Month/Day/Year) | Where were you arrested, cited, detained or charged? (City, State, Country) | Outcome or disposition of the arrest, citation, detention or charge (No charges filed, charges dismissed, jail, probation, etc.) |
|---|---|---|---|
| Traffic Tickets 3 times. | | | |
| | 02/17/2004 | Dallas, TX USA | Paid tickets |
| | 2000 aprox. | In TX going to NM | Paid tickets |
| | | | |

(Gov't Trial Ex. 2 at 10; Joint Final Pretrial Order ¶ E(51)).

115. In his application for naturalization, the Defendant answered "No" in response to Part 10, Section D, Question 17, which asked: "Have you **EVER** been charged with committing any crime or offense?" (Gov't Trial Ex. 2 at 10; Joint Pretrial Order ¶ E(52)).

116. In his application for naturalization, the Defendant answered "No" in response to Part 10, Section D, Question 23, which asked: "Have you **EVER** given false or misleading information to any U.S. government official while applying for any

immigration benefit or to prevent deportation, exclusion, or removal?" (Gov't Trial Ex. 2 at 10; Joint Final Pretrial Order ¶ E(53)).

117. In his application for naturalization, the Defendant answered "No" in response to Part 10, Section D, Question 24, which asked: "Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?" (Gov't Trial Ex. 2 at 10; Joint Final Pretrial Order ¶ E(54)).

118. On February 17, 2004, the Defendant signed his application for naturalization in Part 11 under penalty of perjury pursuant to the laws of the United States, thereby certifying that the information he provided was true and correct (Gov't Trial Ex. 2 at 12; Trial Tr. Vol. I at 126:24-127:2; Joint Final Pretrial Order ¶ E(55)).

## THE DEFENDANT'S NATURALIZATION INTERVIEW AND NATURALIZATION

119. On November 15, 2004, Bridget Parziale, an officer with USCIS, orally interviewed the Defendant regarding his naturalization application to determine his eligibility for naturalization (Gov't Trial Ex. 2; Trial Tr. Vol. I at 174:17-23, 176:10-12; Joint Final Pretrial Order ¶ E(56)).

120. At the beginning of the interview, Officer Parziale placed the Defendant under oath in accordance with her practice in interviewing applicants (Gov't Trial Ex. 2; Trial Tr. Vol. I at 162:9-13; Joint Final Pretrial Order ¶ E(57)).

121. During the interview, Officer Parziale asked the Defendant whether he had ever been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason, consistent with Part 10, Section D, Question 16, of

his application for naturalization (Gov't Trial Ex. 2 at 10; Trial Tr. Vol. I at 182:13-183:3; Joint Final Pretrial Order ¶ E(58)).

122. During the interview and consistent with his written responses, the Defendant testified that he had received three traffic tickets, but otherwise had never been arrested, cited, or detained by any law enforcement or military officer for any other offense (Gov't Trial Ex. 2 at 10; Trial Tr. Vol. I at 183:4-24; Joint Final Pretrial Order ¶ E(59)).

123. Officer Parziale would not have approved Vasquez's naturalization application that day if Vasquez had indicated that he had been detained in military quarters because she would have referred the application to the fraud department for further investigation into whether the Defendant was disqualified from naturalizing (Trial Tr. Vol. I at 184:25-185:15).

124. Officer Parziale would have asked additional questions of the Defendant and requested arrest reports and certified court dispositions (Trial Tr. Vol. I at 186:6-13).

125. Officer Parziale would have conducted further review of the Defendant's application even if he was not found guilty of a crime (Trial Tr. Vol. I at 186:6-9).

126. Officer Parziale would not have granted the Defendant's naturalization application if, during the naturalization interview, the Defendant had informed her that he had been detained in military quarters based on his alleged involvement in the killing of ten individuals during his military service (Trial Tr. Vol. I at 189:21-190:2).

127. At the end of his naturalization interview, the Defendant signed his application for naturalization in Part 13 in the presence of USCIS Officer Parziale and swore that the

contents of his application, including two numbered corrections made at his request, were true to the best of his knowledge (Gov't Trial Ex. 2 at 12; Trial Tr. Vol. I at 188:24-189:10; Joint Final Pretrial Order ¶ E(60)).

128.    Based upon the information supplied by the Defendant in his application for naturalization and based on the sworn answers he gave during his naturalization interview, USCIS approved the application (Gov't Trial Ex. 2; Trial Tr. Vol. I at 189:17-20; Joint Final Pretrial Order ¶ E(61)).

129.    On January 13, 2005, the Defendant took the oath of allegiance and became a naturalized United States citizen (Gov't Trial Ex. 3; Joint Final Pretrial Order ¶ E(62)).

130.    On January 13, 2005, USCIS issued Certificate of Naturalization No. 28623048 to the Defendant (Gov't Trial Ex. 3; Joint Final Pretrial Order ¶ E(63)).

## CONCLUSIONS OF LAW

### DENATURALIZATION GENERALLY

1.    No alien has a right to naturalization "unless all statutory requirements are complied with." *United States v. Ginsberg*, 243 U.S. 472, 474-75 (1917). Indeed, the Supreme Court has underscored that "[t]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981).

2.    Recognizing that there are situations where an individual has naturalized despite failing to comply with all congressionally imposed prerequisites to the acquisition of citizenship or by concealing or misrepresenting facts that are material to the decision

on whether to grant his or her naturalization application, Congress enacted 8 U.S.C. § 1451.

3.     Congress authorized denaturalization where a naturalized citizen either: (1) illegally procured naturalization; or (2) procured naturalization by concealment of material facts or by willful misrepresentation.  8 U.S.C. § 1451(a).

4.     Failure to comply with any of the congressionally imposed prerequisites to the acquisition of citizenship renders the citizenship "illegally procured." *Fedorenko*, 449 U.S. at 506.

5.     Naturalization was procured by concealment of a material fact or by willful misrepresentation, where: (1) the naturalized citizen misrepresented or concealed some fact during the naturalization process; (2) the misrepresentation or concealment was willful; (3) the fact was material; and (4) the naturalized citizen procured citizenship as a result of the misrepresentation or concealment.  *Kungys v. United States*, 485 U.S. 759, 767 (1988).

6.     To prevail in a denaturalization proceeding, the government must prove its case "by clear, unequivocal, and convincing evidence which does not leave the issue in doubt." *Klapprott v. United States*, 335 U.S. 601, 612 (1949).

7.     When a court determines that the government has met its burden of proving that a naturalized citizen obtained his citizenship illegally, or by willful concealment or misrepresentation, it has no discretion to excuse the conduct, and must enter a judgment of denaturalization. *Fedorenko*, 449 U.S. at 517.

8.  Congress has mandated that an individual may not naturalize unless that person "during all periods referred to in this subsection has been and still is a person of good moral character . . . ." *See* 8 U.S.C. § 1427(a)(3). The required statutory period for good moral character typically begins five years before the date the applicant files the application for naturalization, and it continues until the applicant takes the oath of allegiance and becomes a United States citizen (the "statutory period"). *Id*.; 8 C.F.R. § 316.10(a)(1).

9.  Accordingly, the statutory period during which the Defendant was required to demonstrate good moral character ran from February 23, 1999 (the date five years before he filed his February 23, 2004 naturalization application), until he became a U.S. citizen on January 13, 2005.

10. An applicant for naturalization is statutorily precluded from establishing the good moral character necessary to naturalize if, during the statutory period, he has given false testimony, under oath, for the purpose of obtaining an immigration benefit. 8 U.S.C. § 1101(f)(6).

11. "Literally read, [§ 1101(f)(6)] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Kungys*, 485 U.S. at 779–80. "[T]he invalidating intent, like all other factual matters necessary to support denaturalization, must be proved by 'clear, unequivocal, and convincing' evidence which does not leave 'the issue in doubt.'" *Id*. at 781 (quoting

*Schneiderman* [*v. United States*], 320 U.S. 118, 158, 63 S.Ct. 1333, 1352 (1943) (internal quotation marks omitted).

12. During his November 15, 2004 naturalization interview, the Defendant testified under oath that with the exception of three traffic tickets, he had never been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason.

### April 1992 Arrest

13. The Defendant's Ad Hoc Commission military record includes an entry detailing an April 1992 arrest for 15 days "for scandalous behavior for drunkenness and hitting one person" at a restaurant. At trial, the Defendant testified that he had no recollection of being arrested in 1992 (Trial Tr. Vol. I at 125:17-25).

14. The mere fact that the Defendant provided false testimony about his 1992 arrest, an arrest that he does not recollect, standing on its own, does not prove by clear, unequivocal, and convincing evidence that the Defendant testified falsely about the 1992 arrest with the subjective intent of obtaining an immigration benefit.

### El Salvadorian Brigade

15. The Government asks the Court to find that the Defendant testified falsely because he knew that he had been arrested and detained in El Salvador by the Salvadorian military. After reviewing the relevant documents, Dr. Karl opined that the Defendant was arrested and detained in El Salvador after the San Sebastian massacre. However, the Defendant testified that he was never arrested. Further, the Defendant testified that while he was housed in a brigade at the National Guard headquarters in San

30

Salvador during the investigation of the San Sebastian massacre, he was free to move around anywhere within the confines of the brigade (Trial Tr. Vol. I at 136-137, 150-151). Further, he could leave the brigade on his own accord; however, such action, in the Defendant's opinion, would have made him appear to be guilty (Trial Tr. Vol. I at 151). Finally, the Defendant testified that when he traveled from the National Guard Headquarters to the Court of the First Instance to appear before the tribunal, the Defendant drove himself in his own car (Trial Tr. Vol. I at 136-137). Based on the foregoing, the evidence does not prove by clear, unequivocal, and convincing evidence that the Defendant testified falsely about never being arrested or detained as it pertains to the San Sebastian massacre with the subjective intent of obtaining an immigration benefit.

16.     The Government failed to establish by clear, unequivocal, and convincing evidence that the Defendant lacked the requisite good moral character under 8 U.S.C. § 1101(f)(6) to make him ineligible for naturalization under 8 U.S.C. § 1427(a)(3).

**EXTRAJUDICIAL KILLINGS**

17.     As discussed above, as an applicant for naturalization, the Defendant was required to demonstrate good moral character from February 23, 1999 until January 13, 2005. *See* 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1).

18.     An applicant for naturalization is statutorily precluded from establishing the good moral character necessary to naturalize if he "at any time has engaged in conduct described in § 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution,

31

participation in genocide, or commission of acts of torture or extrajudicial killings)

. . . ." 8 U.S.C. § 1101(f)(9).

19. In turn, 8 U.S.C. § 1182(a)(3)(E) provides, in relevant part:

(iii) **Commission of acts of torture or extrajudicial killings**

Any alien who, outside the United States, has committed, ordered,
incited, assisted, or otherwise participated in the commission of—
. . .
(II) under color of law of any foreign nation, any extrajudicial killing,
as defined in section 3(a) of the Torture Victim Protection Act of
1991 (28 U.S.C. 1350 note), is inadmissible.

8 U.S.C. § 1182(a)(3)(E)(iii).

20. The Torture Victim Protection Act of 1991 defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256 § 3(a), 106 Stat. 73, 73 (1992).

21. Thus, any person who has ever "committed, ordered, incited, assisted, or otherwise participated in the commission of" any extrajudicial killing is statutorily barred from establishing the good moral character necessary to naturalize.

22. The San Sebastian massacre is an extrajudicial killing under the TVPA, and is indeed the type of conduct repeatedly practiced by the Salvadorian military during its civil war, which Congress specifically contemplated when passing the TVPA. *See Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002) (explaining that Congress passed the TVPA following the 1980 torture and murder of three

American nuns and a missionary in El Salvador by forces under two military leaders); *see also Matter of Vides Casanova*, 26 I. & N. Dec. 494, 494 (BIA 2015) (finding that during the Salvadorian civil war, the ESAF committed multiple acts of torture and extrajudicial killings).

23. The extrajudicial killings at the San Sebastian massacre were deliberate and not authorized by a previous judgement of a regularly constituted court that afforded judicial guarantees which are recognized as indispensable by civilized people. *See* Torture Victims Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).

***During the San Sebastian massacre, did the Defendant order his soldiers to kill detainees?***

24. The Government asks the Court to find that the Defendant transmitted Beltran's order to his soldiers to finish off the detainees following the ambush. The Government contends that the Defendant's ordering of other soldiers to commit the extrajudicial killings at the San Sebastian massacre, as defined in 8 U.S.C. § 1182(a)(3)(E)(iii), barred the Defendant under 8 U.S.C. § 1101(f)(9) from showing that he had the good moral character necessary to become a naturalized citizen of the United States.

25. The Government rests its argument on the testimony provided to the Truth Commission by four soldiers who were present and participated in the San Sebastian Massacre.

26. However, the testimony by the four soldiers to the Truth Commission is contradictory to the Defendant's testimony. The Defendant testified that he neither ordered nor relayed an order to finish off the detainees after the ambush.

27. Likewise, the testimony by the four soldiers to the Truth Commission is contradictory to Galvez's testimony to the Court of the First Instance. Galvez testified "that he didn't see [the Defendant] committing any illegal act or attempting against the lives or possessions of the prisoners; that he didn't hear [the Defendant] give any order that attempted against the lives or possessions of the prisoners."

28. Based on the foregoing, the Government failed to establish by clear, unequivocal, and convincing evidence that the Defendant lacked the requisite good moral character under 8 U.S.C. § 1101(f)(9) to make him ineligible for naturalization under 8 U.S.C. § 1427(a)(3).

***Did the Defendant assist or otherwise participate in the San Sebastian massacre?***

29. Direct personal involvement in the killings is not required for a finding under 8 U.S.C. § 1182(a)(3)(E)(iii). *See Matter of Vides Casanova*, 26 I. & N. Dec. at 500 (noting the terms of § 1182(a)(3)(E)(iii) "are to be given broad application" and "do not require direct personal involvement"). The standard is broad enough to encompass aid and support to those who carry out the goals, "including statements of incitement or encouragement and actions that result in advancing the violent activities of the group." *Matter of Vides Casanova*, 26 I. & N. Dec. at 500 (citing *Chen v. U.S. Atty. Gen.*, 513 F.3d 1255, 1260 (11th Cir. 2008)).

30. The extent of participation is a matter of first impression in the Fifth Circuit.

31. Only direct and consequential action, not personally caused harm, is required for a finding of assistance in persecution. *See Chen*, 513 F.3d at 1260 (requiring personal conduct that was "active, direct and integral" rather than "merely indirect, peripheral

and inconsequential association"); *Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006) (distinguishing active conduct having "direct consequences for the victims," and conduct merely "tangential to the acts of oppression and passive in nature"); *Singh v. Gonzales*, 417 F.3d 736, 739 (7th Cir. 2005) (requiring a distinction between "genuine assistance in persecution and inconsequential association with persecutors").

32.     The Government asks the Court to find that the Defendant assisted or participated in the San Sebastian massacre by: (1) continuing to detain the captured individuals after receiving Beltran's order to kill, knowing that Beltran was coming to the site to execute the kill order; (2) remaining near the preparation site while the ambush was prepared; and (3) capturing explosives that were used in the ambush.

33.     The authority cited by the Government, however, is distinguishable from the facts herein.  In the cases cited, *supra.*, none of the participants were released from their commands or duties ***prior*** to assisting or otherwise participating in the persecution. Here, the Defendant was released from his command after Beltran ordered the ambush and the Defendant refused to comply with the order.

34.     Based on the foregoing, the Government failed to establish by clear, unequivocal, and convincing evidence that the Defendant lacked the requisite good moral character under 8 U.S.C. § 1101(f)(9) to make him ineligible for naturalization under 8 U.S.C. § 1427(a)(3).

*Did the Defendant exercise command responsibility for the soldiers of the Second Section who committed the San Sebastian massacre?*

35.    Although the TVPA does not explicitly provide for command liability for the violations of their soldiers, "legislative history makes clear that Congress intended to adopt the doctrine of command responsibility from international law as part of the Act." *Ford ex rel. Estate of Ford*, 289 F.3d at 1288-89; *see also Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009).

36.    The elements of the doctrine of command responsibility are: "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes." *Doe v. Drummond Co.*, 782 F.3d 576, 609 (11th Cir. 2015).

37.    "In order to establish the first element (the 'superior-subordinate relationship'), [the Government] must allege facts plausibly suggesting that the [Defendant] had "effective control" over the perpetrators." *Id.* (quoting *Ford*, 289 F.3d at 1290).

38.    Since the Court has concluded that the Defendant had been relieved of his command during the San Sebastian massacre, the Government cannot establish that the Defendant had effective control over the soldiers of the Second Section during the massacre.

39.     Based on the foregoing, the Government failed to establish by clear, unequivocal, and

         convincing evidence that the Defendant lacked the requisite good moral character

         under 8 U.S.C. § 1101(f)(9) to make him ineligible for naturalization under 8 U.S.C.

         § 1427(a)(3).

## LACK OF GOOD MORAL CHARACTER FOR CONCEALMENT AND WILLFUL MISREPRESENTATIONS OF MATERIAL FACTS

40.     Under 8 U.S.C. § 1451(a), this Court must revoke a naturalized person's citizenship

         and cancel his Certificate of Naturalization if that person procured his naturalization

         by concealment of a material fact or by willful misrepresentation.

41.     A naturalized person procured his naturalization by concealment of a material fact

         or by willful misrepresentation if: (1) he misrepresented or concealed a fact or facts

         during his naturalization proceeding; (2) the misrepresentation or concealment was

         willful; (3) the facts were material, *i.e.*, "they had a natural tendency to influence the

         decisions of the Immigration and Naturalization Service"; and (4) the naturalized

         citizen procured citizenship as a result of the misrepresentation or concealment.

         *Kungys*, 485 U.S. 759 at 767, 772 (1988).

42.     A misrepresentation is willful if it is deliberate and voluntary. *See Witter v. I.N.S.*,

         113 F.3d 549, 554 (5th Cir. 1997) (defining willfulness in the context of immigration

         deportation cases). The United States need not demonstrate that the applicant had a

         specific intent to deceive the decision maker. *Id*. Rather, knowledge that the

         information is false suffices to establish willfulness. *Id*.

43. In the context of denaturalization proceedings, the test for materiality is whether the concealments or misrepresentations had a "natural tendency to influence the decisions" of the agency adjudicating the application. *Kungys*, 485 U.S. at 772 ("We hold, therefore, that the test of whether Kungys' concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service.").

44. The test for "procurement" is whether it is "fair to infer that the citizen was actually ineligible" for naturalization. *United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009).

45. The Government argues that the Defendant willfully misrepresented and concealed his criminal history throughout the naturalization process, including denying that he had ever been arrested, cited, or detained beyond three traffic tickets, and denying that he had ever been charged with committing any crime or offense, despite knowing that such representations were false and misleading.

46. The Government further argues that the Defendant's representations regarding whether he had ever been arrested, cited, or detained, and whether he had ever been charged with committing any crime or offense were false. The Government contends that the Defendant knew that he had been arrested, and, at a minimum, detained in El Salvador by the Salvadorian military. The Government asserts that the Defendant knew that he had been charged with committing the crime of intentional homicide of ten civilians.

47.    The Government contends that the Defendant's misrepresentations regarding his criminal history were willful.  The Government argues that simply by signing  his naturalization application under penalty of perjury, the Defendant's misrepresentations were willful.  The Government states that the Defendant knew, at a minimum, that he had been detained and charged by a civilian Salvadorian court for the San Sebastian massacre.

48.    The Government further agues that because the Defendant knew that the foregoing representations were false and misleading, yet made voluntarily and deliberately, the Defendant made the misrepresentations willfully.

49.    The Government contends that the Defendant's misrepresentation of his criminal history was material to his naturalization. By not answering the relevant questions on his naturalization application truthfully, the Government argues that the Defendant concealed his criminal history and prevented USCIS from further investigating his role in the San Sebastian massacre and determining whether such actions adversely impacted his moral character.

50.    The Government argues that USCIS would not have approved the Defendant's naturalization application on November 15, 2004 and would have required additional investigation to determine his eligibility, such that the Defendant would not have been permitted to naturalize on January 13, 2005, had he disclosed his criminal history.

51.    The Government asserts that the Defendant's misrepresentations and concealments were material to his naturalization because the true information would have had a

natural tendency to influence USCIS's decision whether to approve the Defendant's N-400 application and approve him for naturalization as a United States citizen.

52. Finally, the Government argues that the Defendant procured his naturalization by willful misrepresentation and concealment of material facts and his citizenship should be revoked pursuant to the requirements of 8 U.S.C. § 1451(a).

53. The Court finds that its conclusions, *supra.*, with respect to the Defendant's testimony regarding arrest and detention are dispositive herein and are equally applicable to whether the Defendant misrepresented or concealed if he was charged with an offense. The Defendant testified that he was under investigation for his involvement with the San Sebastian massacre, not charged with an offense. Additionally, the Defendant testified that during the investigation, he was interviewed in San Sebastian, and the interview only lasted three to four hours (Trial Tr. Vol. I at 136-137). While there are records from several tribunals concerning the Defendant's involvement in the San Sebastian massacre, the Defendant maintains that he was investigated, but never charged, with an offense. Based on the foregoing, the evidence does not prove by clear, unequivocal, and convincing evidence that the Defendant willfully misrepresented and concealed his criminal history throughout the naturalization process by denying that he had ever been arrested, cited, or detained beyond three traffic tickets, or by denying that he had ever been charged with committing any crime or offense.

54. "[B]earing in mind the unusually high burden of proof in denaturalization cases," the Court finds that the Government failed to establish by clear, unequivocal, and

convincing evidence that the Defendant procured his naturalization by willful misrepresentation and concealment of material facts. *Kungys*, 485 U.S. at 776. As such, the Government failed to prove that the Defendant's citizenship should be revoked pursuant to the requirements of 8 U.S.C. § 1451(a).

**CONCLUSION**

In conjunction with these Findings of Fact and Conclusions of Law, the Court will enter a Final Judgment denying the Government's request to revoke the Defendant's citizenship.

**IT IS SO ORDERED**.

**SIGNED this 28th day of March, 2019.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE